**E-FILED**
Tuesday, 22 March, 2016  04:03:07 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **GERALD LEE ROOF,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 14-cv-3189** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. DISTRICT JUDGE:**

Plaintiff Gerald Lee Roof appeals from the Commissioner of Social Security's denial of Roof's application for supplemental security income.   Having reviewed the record and the briefs, the Court finds that the decision denying Roof's application was supported by substantial evidence.  Roof's Motion for Summary Judgment (d/e 11) is DENIED.  The Commissioner's Motion for Summary Affirmance (d/e 16) is GRANTED, and the Commissioner's decision is AFFIRMED.

## I.   Background

Roof is 29 years old.  He applied for supplemental social security income on September 30, 2011.  Roof alleged that he is disabled under Section 1614(a)(3)(A) of the Social Security Act.  The Act defines disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

On January 30, 2013, Administrative Law Judge (ALJ) Diane Raese Flebbe held a video hearing and heard testimony from Roof, Roof's psychotherapist Ron Kanwischer, and vocational expert Amanda Ortman.

### A.   Roof's testimony

At the hearing, Roof testified that "stress" and "pressure and having to be places at a certain time and accomplish things in a certain timeframe" provoke in him "severe anxiety that leads to nausea and vomiting" (R. 63).  Roof testified that he has "lots" of obsessions: "it's hard for me to walk through doors certain ways"; "It's hard for me to say certain words or talk about certain types of

things."; "I have to … close door handles a certain way. … if I don't
… my anxiety skyrockets and it turns into severe anxiety and that's
what gets me to not be able … to do anything" (R. 64).  Roof
explained that attempts to neutralize his thoughts or compulsions
are not often successful: his thoughts "trigger the compulsions and
the compulsions trigger more thoughts and it's just a big cycle of
obsessions and compulsions" (R. 64-65).  Roof testified, "I have to
wash my hands a certain way.  It takes me … three to five minutes.
I've got to wash my hands a certain way, shake them off a certain
way, dry them a certain way, exit the bathroom a certain way.  And
if I mess any of those up it starts all over again. … I have to do it all
over again until I feel like I got it right" (R. 67)  Roof said that he
cannot usually deal with anything else while he is having his
thoughts or compulsions: "Anything that I would be doing would
take five times as long … if I were to finish it [at all] because a lot of
the time[] … I'll get frustrated and shut myself down trying to deal
with the obsessions and compulsions and the feelings of extreme
anxiety that I'm having" (R. 69).

Roof sought treatment for his symptoms in 2008.  Roof
testified that he sought treatment because "I wasn't able to get out

of bed for, you know, sometimes a day and a half.  I didn't leave the house … sometimes at all for a week" (R. 63).  After several years of treatment, Roof testified, his condition has improved, though he is "afraid to backslide back to that" (R. 63, 65).  "[O]ne of my biggest concerns," Roof said, "is the possibility [of my worst symptoms] coming back" (R. 78).

Roof testified that he attended high school but did not finish 11th grade (R. 60); that he has no special vocational training (R. 61); that he previously worked part-time doing dishes and making pizza while in school (R. 69-70); that he has been volunteering at a local radio station for about 10 years (R. 61); that he volunteers at the station once a week for 3 hours at a time (R. 62); and that he has not tried to work anywhere besides the station since 2003 (R. 70, 80).

Roof testified that he lives alone in a house; that he drives 6 days a week; that he goes to the grocery store; that he cooks food in the microwave; that he generally does not vacuum, mow his yard, or shovel snow; and that his grandfather usually does his laundry (R. 71-72).

Roof testified that he still misses and has to reschedule appointments because of his condition, although he has not "so much" had to miss his scheduled broadcasts at the radio station (R. 65). The radio station, Roof said, is a place where he is "very comfortable …. It's one of the only places that I'm actually remotely what I would describe [as] comfortable in my day-to-day life" (R. 65-66).

Roof testified that he sleeps from 2:00 AM to 11:00 AM or noon—though it is a "relatively restless" sleep (R. 66). On a typical day, Roof said, "If I'm feeling decent that day I'll get up … go to the bathroom … check my text[s] to see if anybody got a hold of me for anything, watch TV, get a hold of my grandpa … go to Springfield and hang out with him for a little bit" (R. 66-67). Roof said that he visits his grandfather 3-4 times per week, and they usually watch TV and talk (R. 67). But, on some days, Roof said, he "[w]on't get out of bed until 5:00 in the afternoon because I'm … worried about what's going to happen when I get out of bed and I'm worried about what I need to do that day" (R. 78).

Roof testified that he has had a girlfriend for almost 2 years (R. 67). They met at a bar in downtown Springfield (R. 72-73). They

see each other daily and often watch TV together (R. 68).  Roof said
that his rituals do "get in the way" when he spends time with his
girlfriend: "she'll be ready to go and I'll have to – you know, I'll have
things I have to do before I [leave] the house. … I try not to let it get
out how bad it is … because I don't want her to think I'm a weirdo.
… I'll usually let her either go out[side] first or I'll go out a few
minutes before she does so that I can accomplish … closing the
door a certain way, getting in my car and starting it a certain way
so that she doesn't see fully … she knows I have these problems but
… I don't like to bring them up" (R. 68-69).

Roof testified that he does not have any hobbies, but he does
like technology, likes to "read stuff on the Internet" (R. 69), plays
computer Solitaire (R. 74), and maintains an email account and a
Facebook page (R. 73).  Roof said he spends a few hours per day on
the computer, and more on his smartphone—perhaps another hour
(R. 74).  Roof testified that he goes downtown once a month to see
shows, and that he and his girlfriend go out to eat downtown (R.
73).  In the past 2 years, Roof said, he has left Illinois only once: a
trip Indianapolis to see a concert by the heavy metal group Danzig
(R. 75).

The ALJ was plainly skeptical about Roof's alleged disability. "[Y]ou're describing a number of activities that seem like[,] if you can do those things why wouldn't you be able to work," the ALJ asked Roof (R. 76).  "If you can go to a club or a bar or a concert and be in a group of strangers once a month to hear a band play, if you and your girlfriend can go out to eat, you get in the car and drive six days a week, you use the computer and focus and look things up and read about technology and respond to emails and answer phone calls and text people, why would I say you're not able to work?" (R. 76)

Roof responded, "There's no pressure there.  There's … nothing that scares me about certain things like that. … [And] I do get sick when I go out to places like going to clubs to see concerts.  I will throw up on the way there.  I will throw up there.  Sometimes I throw up in the bathroom. … But again there's no pressure, there's no stress … I'm able to do those things because of the lack of stress and responsibility" (R. 76).

The ALJ prodded Roof further.  "If you're able to manage these symptoms when you want to in order to see your girlfriend daily … then why could you not manage them in order to go to work daily if

that was important enough?  If it's important enough to go to a concert so you've learned to deal with some symptoms to overcome…" (R. 77).

Roof responded, "Well, the dealing with that involves throwing up.  … I don't hide everything from her …. she still sees it.  … [A]gain there's not a whole lot of stress or pressure there.  We're just sitting around watching TV" (R. 77).

### B.    Kanwischer's testimony

Ron Kanwischer—a Clinical Professional Counselor and Roof's psychotherapist since 2008—testified that he sees Roof once per month or so.  At first, Kanwischer said, Roof was unable even to "come in the door because he was out in the parking lot vomiting because his anxiety was so severe" (R. 42).  But after aborting the first few attempts to meet, Roof was finally able to enter the building to be evaluated.

Kanwischer testified that in 2008 Roof "probably ha[d] one of the worst cases of OCD I've ever seen," though Roof's condition is "better now" (R. 42, 56).  Kanwischer testified that Roof suffers from an "irrational fear that if he revealed some of his rituals [to his caregivers] something bad would either happen to his pets or his

family" (R. 42).  Also due Roof's "reluctan[ce]" to share information

with his caregivers, it took time to learn "just how disturbed [Roof]

is in some ways," and Kanwischer generally speaks to Roof's

grandfather during each of Roof's visits "to gain his perspective on

what's going on" (R. 42).  Although Kanwischer was able to identify

some of Roof's rituals—such as often needing to touch objects with

only the left hand and having to perform a certain ritual upon

seeing a certain word in the newspaper or before entering an

automobile—Kanwischer testified, "I don't even probably know the

extent of everything that goes on" (R. 43).  Kanwischer testified that

Roof missed a recent appointment "because he had to do certain

rituals before he left … [and] couldn't get out of his apartment door"

(R. 44).

Kanwischer testified that Roof's growing tension and anxiety

overwhelms him, sometimes leading to vomiting, and that

performing the appropriate ritual relieves the tension (R. 44).

Sometimes, though, "th[e] scenario repeats itself multiple times and

[he] becomes incapacitated" (R. 44).  Over time, Kanwischer

testified, Roof's condition has improved: "He no longer vomits every

time he comes in.  He subjectively reports that his ritual behavior is

reduced but it's still at a point where I think that he's pretty much homebound" (R. 45). Pushed on this point, Kanwischer acknowledged, "[H]e's not totally incapacitated. He can get out for hours at a time. [But] what will happen [is] he'll be able to do brief st[i]nts, an hour, two hours, three hours, maybe four hours at most, but then there's always a ritual involved somewhere and mostly, again, it involves fear and that something bad will happen" (R. 46).

Regarding Roof's ability to work, Kanwischer opined, "What I'm afraid of … is that it will create a circular pattern of … getting a job but then losing it and that repeating itself over time to the point where no employer will hire him because his record will be so poor" (R. 47). Roof would likely lose any job he were to get, Kanwischer testified, because Roof "will either not be able to perform a particular task because he won't be able to focus or concentrate because his anxiety will be so high. … He'll lose the ability to pay attention to what he's doing. … [H]e most likely then will leave whatever environment he's in to perform the ritual. … [T]hat could be extremely disruptive … in most job situations" (R. 47).

The ALJ asked Kanwischer how to reconcile the assertion that Roof is too disabled to work with the fact that Roof engages in activities such as volunteering at the radio station and going out with a girlfriend—activities that in the ALJ's view "reflect … maybe still some problems but they don't reflect much more than moderate" (R. 49).  Kanwischer responded that Roof "finds unique circumstances that he can function in.  … He is able to sustain these kinds of activities for hours at a time … but sustaining much [more] interaction with people, with doing things he's not familiar with … produces a lot more anxiety" (R. 50).

The ALJ asked Kanwischer, "[W]hat would be the problem with having a job where he worked independently … not part of a team, not doing work where … other people were waiting down the line for his work to be finished … if he had an independent job [without] public contact … and [he] was not a member of a team but worked on his own duties[?]" (R. 50-51).  Kanwischer responded that such a job "would make intuitive sense," but that Roof's anxiety varies from week to week, sometimes preventing him from leaving the house (R. 51-52).  Kanwischer testified that even an unskilled job involving no public interaction "would work against [Roof].  I think

that what would happen is most likely he would fail in it and then fall into this kind of repeated pattern of failing…" (R. 58).

## C.  Ortman's testimony

The ALJ asked Vocational Expert Amanda Ortman to assume that Roof has moderate limitations in concentration, persistence, or pace and is limited to jobs that do not require complex or detailed job processes and have little in the way of change in job process from day to day.  The ALJ also asked Ortman to assume that the work should not involve fast-paced hourly production demands, but only daily outputs, and that the work should not involve more than occasional interaction with the public, coworkers, and supervisors.

Ortman testified that a substantial number of jobs exist that someone like Roof could perform, such as dining room attendant, kitchen helper, and order clerk.  Ortman testified that, if Roof were further limited to no interaction at all with the public, he would not be able to perform the order clerk position, but he could still perform the jobs of dining room attendant or kitchen helper, and he could also perform the job of a shipping and routing clerk.  Ortman further testified that a limitation that Roof should work independently and not on a team would not eliminate his ability to

perform any of those jobs.  But, Ortman said, Roof would not be able to perform those jobs if Roof: (a) would be likely to miss 2 or more days of work per month; (b) were off task for 20 percent or more of the day; or (c) were to miss 2 hours of work once per week on average.

### D.    The ALJ's findings

The ALJ found that Roof has not been disabled as defined by the Social Security Act since Roof filed his application for disability benefits on September 30, 2011.  In reaching this finding, the ALJ used the traditional 5-step evaluation process.  20 C.F.R. § 416.920.

At Step 1, the ALJ found that Roof has not engaged in substantial gainful activity since September 30, 2011.  At Step 2, the ALJ found that Roof has severe impairments in the form of generalized anxiety disorder and obsessive compulsive disorder.

At Step 3, the ALJ found that Roof does not have an impairment or a combination of impairments that meet or medically equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ found that Roof has a "mild restriction" in the "activities of daily living," and "moderate

difficulties" in "social functioning" and "concentration, persistence or pace" (R. 18).

At Step 4, the ALJ found that Roof has the residual functioning capacity to perform a full range of work at all exertional levels with the following limitations: because of his mental impairments and symptoms, Roof may during times of symptom exacerbation have moderate limitations in concentration, persistence, and pace when attempting complex or detailed tasks—limiting Roof to jobs that do not require complex or detailed job processes, that have little day-to-day change in job process, that involve daily output quotas rather than fast-paced production demands, and that involve only occasional work interaction with the general public, coworkers, and supervisors.  The ALJ also found that Roof does not have any past relevant work.

Finally, at Step 5, the ALJ found that jobs exist in significant numbers in the national economy that Roof can perform, given his age, education, work experience, and residual functioning capacity. (See the vocational expert's testimony described above.)

Essentially, the ALJ determined that Roof's medically determinable impairments could reasonably be expected to cause

Roof's claimed symptoms—but that Roof's statements regarding the intensity, persistence, and limiting effects of those symptoms were not fully credible.  In the ALJ's view, the evidence did not support the degree of limitation Roof alleged.  The ALJ noted that Roof lives independently, drives 6 days a week, goes to the grocery store, volunteers at a radio station, uses his smartphone and computer for 4 hours a day, visits his grandfather 3-4 times a week, has a girlfriend whom he met at a bar and with whom he goes out to eat occasionally and to a show monthly—and that his reported stress and vomiting does not stop him from these activities, nor from traveling to Indianapolis to see a concert as he had done 6 months before the hearing.  "It appears," the ALJ wrote, "[that Roof] is able to function in public, even in larger venues and among strangers, when he chooses"; that Roof could "manipulate a fair amount" of the "symptoms/actions" in his life; and that Roof's condition had "improved with medication management and therapy" (R. 22).

In reaching her conclusions, the ALJ did not accept Dr. Kanwischer's opinion that Roof could perform no work.  The treatment reports, the ALJ wrote, "show [that Roof] is doing better than alleged"—and Dr. Kanwischer's testimony that Roof cannot

leave home for a week at a time and cannot get out of bed for a day or so was not supported by the treatment reports in the record or by Roof's own testimony at the hearing (R. 23).  The ALJ also gave significant weight to Roof's "global assessment of functioning" (GAF) scores, which had "remained consistently in the mild to moderate range" (R. 22).  Roof, the ALJ concluded, did not meet his burden of presenting credible evidence that he is unable to perform and sustain full-time work.

Regarding Roof's employment opportunities, the ALJ found that Roof is capable of making a successful adjustment to work that exists in significant numbers in the national economy.  The ALJ noted that the vocational expert had identified jobs that someone with Roof's vocational profile and residual functioning capacity could perform—jobs that do not involve fast-paced hourly production demands, day-to-day change, or complex or detailed job processes, and that involve only occasional interaction with the public, co-workers, and supervisors.

Roof appealed the ALJ's decision, but the Appeals Council denied the appeal, making the ALJ's decision the final decision of the Commissioner.

## II.    Legal Standard

On appeal, the Court assesses whether the Commissioner's decision is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quotation omitted).  If the Commissioner's decision is supported by substantial evidence, the Court may not substitute its own judgment.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).

In ruling on a claimant's application, an ALJ must sufficiently articulate her evaluation of the evidence so that the reviewing court may follow the reasoning and confirm that the ALJ considered all the important evidence.  Rohan v. Chater, 98 F.3d 966, 971 (7th Cir. 1996).  In other words, the ALJ must "build an accurate and logical bridge from the evidence to [the] conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

## III.    Issues

Roof argues that the ALJ improperly rejected Kanwischer's opinons, that the ALJ improperly discredited Roof's testimony, and

that the ALJ erred in making her residual functional capacity findings and in presenting hypotheticals to the vocational expert.

### A.    The ALJ properly rejected Kanwischer's opinions.

The ALJ rejected Kanwischer's opinions because the treatment reports showed Roof doing better than alleged and because Roof's actual activities were consistent with his moderate RFC scores and not consistent with Kanwischer's testimony.  But Roof argues that, contrary to the ALJ's finding that the record contradicts Kanwischer's opinion, the record actually supports Kanwischer's opinion.

Roof says that the ALJ's finding that Roof's treatment reports do not support Kanwisher's testimony is "simply wrong" (d/e 13 at 17).  Roof cites a treatment report from 2011 that describes Roof's anxiety as often "incapacitating" (R. 362).  However, the word "incapacitating" in that report is a reference to Roof's own description of his symptoms, not the treatment provider's diagnosis or evaluation.  And indeed, Roof acknowledges that his anxiety improved with treatment.

But although his anxiety may have improved, Roof says that his obsessions and compulsions have <u>not</u> improved, and that they

still interfere with his daily activities.  It is clear from the record,

Roof says, that he has episodic symptoms that interfere with his

ability: to attend work on a schedule, to focus his attention and

concentration, and to persist and complete needed tasks.  Roof

argues that the ALJ's belief that Roof could "manipulate" his

symptoms was unsupported by any medical evidence and in fact

reveals a failure to understand that mental illness can be episodic—

a common failure that the Seventh Circuit has criticized:

> [A] person who suffers from a mental illness will have
> better days and worse days, so a snapshot of any single
> moment says little about her overall condition. ... Even if
> we accept the March 2007 treatment note as evidence
> that Punzio enjoys a few "good days," that evidence still
> offers no support for the ALJ's finding that her mental
> illness does not prevent her from holding a job.  After all,
> the vocational expert testified that no employer would
> hire Punzio to perform unskilled work if her mental
> illness limits her abilities even just 20 percent of the
> time—or if she experiences as few as three "bad days" a
> month that cause her to miss work.

Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011).  Further, Roof

says, the ALJ compounded her mistake by concluding that one's

behavior at home is evidence of whether one is employable.  Voigt v.

Colvin, 781 F.3d 871, 878 (7th Cir. 2015) (ALJ erred in "thinking

that how one uses his time at home is compelling evidence of

whether or not one is employable").  Just because Roof can perform certain activities of daily living, Roof says, that does not mean he can work.  <u>Punzio</u>, 630 F.3d at 712.

The Court finds that the ALJ's decision to credit other evidence over Kanwischer's testimony was supported by evidence that a reasonable person might accept as adequate.  Far from having improperly relied on a "snapshot" of Roof's condition, the ALJ observed that Roof's GAF scores reflected mild-to-moderate symptoms.  As Roof notes, GAF scores address functioning only at a specific point in time.  But Roof's GAF scores—which indicated mildly-to-moderately severe limitations—were consistent.  The ALJ reasonably credited the mild-to-moderate severity reflected by the GAF scores over Hanwischer's testimony and reasonably considered the discrepancy between Hanwischer's testimony and Roof's treatment notes.  <u>See</u> <u>Perales</u>, 402 U.S. 289 (evidence from treatment reports can outweigh contrary testimony).  In concluding that Roof's treatment reports showed he was doing "better than alleged" (R. 23) and better than as described by Kanwischer, the ALJ essentially found that a conflict existed between Hanwischer's testimony and the medical records—and that this conflict justified a

conclusion that the testimony overstated Roof's functional limitations.

Roof also argues that the ALJ did not sufficiently address the factors required by Social Security Rule 06-3p, including Kanwischer's 4-year history with Roof, Kanwischer's detailed articulation of and support for the reasons for his opinions, and Kanwischer's years of experience and expertise as a counselor.  A proper evaluation of the SSR 06-3p factors, Roof says, would support Kanwischer's opinions, not the ALJ's findings.

But SSR 06-03p does not require ALJs to explicitly discuss each of the factors used to weigh opinions by a provider who, like Kanwischer, does not technically qualify as an "acceptable medical source" under the Rule.  Rather, the ALJ "generally should" explain the weight given to such an opinion so that the reviewing court can "follow the [ALJ's] reasoning."  Social Security Rule 06-03p.  And even when evaluating the opinion of a provider who <u>does</u> qualify as an "acceptable medical source," the ALJ need only "minimally articulate[] his reasons—a very deferential standard that [the Seventh Circuit] has … deemed lax."  <u>Elder v. Astrue</u>, 529 F.3d 408, 415 (7th Cir. 2008) (quotations omitted).  Here, the Court finds that

the ALJ sufficiently articulated her reasons for discrediting

Kanwischer's testimony.

### B. The ALJ provided adequate support for her credibility finding.

The ALJ found that Roof's statements regarding the intensity,

persistence, and limiting effects of those symptoms were not fully

credible.  Roof argues that this finding was unsupported and is

contrary to law.

The ALJ's credibility finding must be upheld as long as it is

"not patently wrong, is supported by substantial evidence, and is

sufficiently detailed that [the Court] is able to trace its path of

reasoning."  Schmidt v. Barnhart, 395 F.3d 737, 747 (7th Cir.

2005).  The Court shows significant deference to the ALJ's findings

about witness credibility because "the ALJ is in the best position to

observe witnesses" and the ALJ's assessment may involve

"inarticulable elements that leave no trace that can be discerned in

[any] transcript."  Herron v. Shalala, 19 F.3d 329, 335 (7th Cir.

1994) (quotation omitted).  The Court will not review the ALJ's

credibility determinations unless the determinations lack any

explanations or support in the record.  Elder v. Astrue, 529 F.3d

408, 413-14 (7th Cir. 2008); <u>Shauger v. Astrue</u>, 675 F.3d 690, 696 (7th Cir. 2012) (ALJ must support credibility findings with evidence from record).  But if a credibility finding rests on objective factors or on fundamental implausibilities—rather than on a claimant's demeanor or other subjective factors—the reviewing court has "greater freedom" to evaluate the ALJ's findings.  <u>Schomas v. Colvin</u>, 732 F.3d 702, 708 (7th Cir. 2013) (quotation omitted).

Here, Roof says, the ALJ's credibility assessment of Roof was not based on Roof's demeanor or other subjective factors—rather, it was based on Roof's activities and on the ALJ's finding that Roof manipulates his symptoms to do certain activities.  Thus, Roof says, the Court has greater leeway to evaluate the ALJ's credibility assessment.

Roof argues that the ALJ evaluated Roof's daily activities as the primary factor in determining that Roof was not credible, but that the ALJ did not analyze the other six factors in Social Security Rule 96-7p, such as the "location, duration, frequency, and intensity of the individual's pain or other symptoms," and factors that "precipitate and aggravate the symptoms."  Social Security Rule 96-7p.  In particular, Roof says, the ALJ did not consider

Roof's problem with rituals and compulsions, which were shown in the psychiatric treatment notes and Kanwischer's treatment notes, and which were the primary focus of the testimony at Roof's hearing.

But the ALJ did note the duration, frequency, and intensity of Roof's symptoms and the precipitating and aggravating factors of Roof's anxiety, in addition to the effectiveness of his treatment, the psychotherapy Roof received, the measures Roof took to relieve his symptoms, and Roof's functional limitations and restrictions caused by his symptoms (R. 20-21).  Further, even if the ALJ had omitted one or more of the SSR 96-7p factors, omitting "an evidentiary basis for the credibility finding" is not fatal if "the record provides adequate support for the ALJ's credibility finding."  Jens v. Barnhart, 347 F.3d 209, 213 (7th Cir. 2003).  An ALJ complies with SSR 96-7p if the ALJ states "specific reasons that are supported by the record" for the credibility finding.  Skarbek v. Barnart, 390 F.3d 500, 505 (7th Cir. 2004).  Specifically identifying "which [particular] statements were not credible" is not required.  Shideler v. Astrue, 688 F.3d 308, 312 (7th Cir. 2012).  Here, the Court finds that the ALJ provided adequate support for her credibility finding.

Roof also argues that the ALJ's characterization of his
testimony regarding his daily activities is inaccurate.  The ALJ
wrote that Roof reported that he lives independently and is
independent with his personal care, while Roof says that he had
actually reported getting nervous about even changing his clothes
and that his grandfather must remind him to bathe, to change
clothes, and to take his medicine (R. 177-78).  But the self-
assessment report Roof cites was completed in 2009.  In 2011, Roof
reported being able "to do his daily ta[s]ks" and to "take care of
himself" (R. 427).  And at the hearing in 2013, Roof testified that,
on a typical day, "If I'm feeling decent that day I'll get up … go to the
bathroom … check my text[s] to see if anybody got a hold of me for
anything, watch TV, get a hold of my grandpa … go to Springfield
and hang out with him for a little bit" (R. 66-67).  Roof also testified
that he drives 6 days per week, sees his girlfriend daily, and goes
grocery shopping and prepares food for himself.  It was reasonable
for the ALJ to describe Roof as living independently and being
generally independent with respect to personal care.

## C.     The ALJ's residual functioning capacity assessment accurately addressed Roof's limitations.

Roof argues that the ALJ's residual functioning capacity (RFC) assessment failed to sufficiently address his functional limitations. The ALJ found that Roof has moderate limitations in concentration, persistence, and pace when attempting complex or detailed tasks—limiting Roof to jobs not requiring complex or detailed job processes.  The ALJ's findings, Roof says, do not address reviewing state agency psychologist Dr. Lionel Hudspeth's finding that Roof had moderate impairment in his ability to tolerate supervision, maintain regular attendance, or complete work tasks punctually (R. 384-85).  Rather, Roof says, the ALJ assumed no impairment in these areas—perhaps, Roof suspects, due to the ALJ's assumption that Roof's behavior is volitional.

The Court finds that the ALJ's RFC findings are consistent with the findings of Dr. Hudspeth that Roof cites.  The ALJ's finding that Roof has moderate limitations with respect to persistence and pace is analogous to Dr. Hudspeth's finding that Roof had moderate impairment in his ability to complete work tasks punctually. Moreover, Dr. Hudspeth's recommendation that Roof "would be best

served by having low pressure work assignments" (R. 386) mirrors the ALJ's comments almost exactly.  Indeed, if anything, the ALJ's findings ascribed to Roof a greater degree of limitation than Dr. Hudspeth's findings.  Dr. Hudspeth concluded that Roof had only mild difficulties in maintaining social functioning (R. 380), whereas the ALJ found moderate difficulties.  Dr. Hudspeth wrote that Roof did not have "any significant social or behavioral impediment to the work environment" and that Roof had no significant limitation interacting appropriately with the general public or getting along with co-workers (R. 385-86), whereas the ALJ limited Roof to only occasional contact with supervisors, co-workers, and the general public.  Finally, Dr. Hudspeth found that Roof did not have any significant limitation responding appropriately to changes in a workplace setting, whereas the ALJ limited Roof to jobs having little day-to-day change in job process.  The Court therefore finds that the ALJ's RFC findings accurately addressed Roof's limitations.

   **D.    The ALJ's hypothetical to the vocational expert adequately oriented the expert to the totality of Roof's impairment.**

   Roof also argues that the ALJ's hypothetical to the vocational expert failed to adequately orient the expert to the totality of Roof's

impairment.  An ALJ must provide a vocational expert with a complete picture of a claimant's residual functioning capacity, and a claimant's limitations in concentration, persistence, and pace require hypothetical questions to a vocational expert that adequately capture those limitations.  <u>Jelinek v. Astrue</u>, 662 F.3d 805, 813 (7th Cir. 2011).

Here, Roof says, the ALJ's hypothetical failed to advise the vocational expert about Roof's significant deficiencies in persistency and pace—deficiencies that result in an inability to sustain activity within a schedule and complete tasks in a timely manner.  Roof says that, when the appropriate limitations are considered, Roof cannot be found capable of performing the jobs that the ALJ found Roof capable of performing.

But the ALJ specifically asked the vocational expert to assume that there would be "periods of symptom exacerbation" and that any work "should not involve fast paced hourly production demand but rather requires … work that is done on a daily output"—and the vocational expert nevertheless found that such a person could perform such work (R. 81).  The Court finds that the ALJ's

hypothetical to the vocational expert adequately oriented the expert to the totality of Roof's impairment.

## IV.   Conclusion

For the reasons above, Roof's Motion for Summary Judgment (d/e 11) is DENIED and the Commissioner's Motion for Summary Affirmance (d/e 16) is GRANTED.  The decision of the Commissioner is AFFIRMED.

ENTER: March 22, 2016

FOR THE COURT:

<u>       s/Sue E. Myerscough</u>
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE